UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MELANIE M. RITCHIE,<br><br>                           Plaintiff,<br><br>            -against-<br><br>ANDREW M. SAUL,[1]<br>Commissioner of Social Security,<br><br>                     Defendant. | 19cv01378 (DF)<br><br>**MEMORANDUM<br>AND ORDER** |

**DEBRA FREEMAN, United States Magistrate Judge:**

In this Social Security action, which is before this Court on consent pursuant to 28 U.S.C. § 636(c), plaintiff Melanie M. Ritchie ("Plaintiff") seeks review of the final decision of defendant Nancy A. Berryhill, former Acting Commissioner of the Social Security Administration ("SSA"), succeeded by Andrew M. Saul, ("Defendant" or the "Commissioner"), denying Plaintiff Supplemental Security Income ("SSI") and Social Security Disability Insurance ("SSDI") under the Social Security Act (the "Act") on the grounds that, for the relevant period, "medical improvement" had occurred, such that Plaintiff's impairments no longer constituted a disability under the Act.  Currently before the Court is Plaintiff's motion, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings reversing the Commissioner's decision.  (Dkt. 17.)  Also before the Court is the Commissioner's cross-motion for judgment on the pleadings affirming the Commissioner's decision.  (Dkt. 20.)

---

[1] Andrew M. Saul, having been appointed Commissioner of the Social Security Administration ("SSA"), is substituted for Acting Commissioner Nancy A. Berryhill, pursuant to Federal Rule of Civil Procedure 25(d).

For the reasons set forth below, Plaintiff's motion is granted to the extent that it seeks remand for further administrative proceedings, and Defendant's cross-motion is denied.

## BACKGROUND[2]

Plaintiff filed an application for SSDI on November 4, 2015 (R. at 161-62) and an application for SSI on December 7, 2015 (*id.* at 163-69).  In both applications, Plaintiff alleged a disability onset date of October 9, 2015 due to exacerbation of lower back pain.  (*Id.* at 161-69.) After Plaintiff's claims were denied initially on January 4, 2016 (*id.* at 91-98), Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (*id.* at 103-05).  Plaintiff, represented by counsel, testified by videoconference before ALJ Michael J. Stacchini, at a hearing conducted on October 19, 2017 (the "Hearing").  (*Id.* at 121-27; *see also id.* at 27-58.)  At the Hearing, the ALJ also heard testimony from Mary Ann Morocco, a vocational expert ("VE").  (*Id.* at 50-55.)

On March 21, 2018, the ALJ issued a partially favorable decision finding that the Plaintiff was disabled from October 9, 2015 through October 25, 2017, but that Plaintiff's disability ended on October 26, 2017 because of medical improvement.  (*Id.* at 8-26.)  Plaintiff sought review of the portion of the decision that held there had been medical improvement as of October 26, 2017 and filed a Request for Review of a Hearing Decision on April 17, 2018.  (*Id.* at 157-60.)  The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review on December 10, 2018.  (*Id.* at 1-6.)  Plaintiff now challenges the Commissioner's denial of benefits for the period beginning October 26, 2017.

---

[2] The background facts set forth herein are taken from the SSA Administrative Record (Dkt. 15) (referred to herein as "R." or the "Record").

A.      **Plaintiff's Personal and Employment History**

Plaintiff was born on October 28, 1970, such that she was 44 years old as of her alleged

disability onset date of October 9, 2015.  (*Id.* at 7.)  In her Function Report, Plaintiff indicated

that she had received her GED in 1988 and had completed training in 2002 to become a certified

nursing assistant ("CNA").  (*Id.* at 212.)  According to Plaintiff, she was employed as a

"warehouse worker" from September 2002 through March 2003.  (*Id.* at 213.)  In addition, since

2002, she had reportedly worked on and off as a patient care aide and a CNA.  (*Id.*)

At the Hearing, Plaintiff testified that her most recent job was as a part-time home

attendant for elderly adults and that she stopped working in June of 2017.  (*Id.* at 37-38.)  She

explained that, as a home attendant for the elderly, her responsibilities had included "feeding,

cooking, [and] washing them down."  (*Id.* at 38.)  Plaintiff testified that she stopped working

because she "just couldn't work anymore."  (*Id.* at 37.)

Plaintiff testified that she lived with her two children, ages 9 and 14,[3] and her sister.  (*Id.*

at 35.)  When asked what she did with her children for enjoyment, she stated, "[m]y kids will go

to the movies, but not with me."  (*Id.* at 36.)  Plaintiff testified that she drove and used public

transportation, which she described as "[m]edical transportation."  (*Id.* at 38-39.)  She further

testified that she did not exercise or go out with friends at all.  (*Id.* at 39.)  She stated in her

Function Report that her hobbies included reading and watching television, and that she typically

spent all day engaged in these activities.  (*Id.* at 227.)

---

[3] Although, at the Hearing, Plaintiff testified that she lived her two children (*id.* at 35), she stated in her application for disability insurance benefits that she had five children (*see id.* at 162).

### B.    Medical Evidence

Although the relevant period under review for the purpose of Social Security benefits only runs from October 26, 2017 (the date by which the ALJ concluded that medical improvement had occurred) to the present, the Court will summarize the body of evidence that was before the ALJ when he rendered his decision.

### 1.    Evidence Pre-Dating the Relevant Period

Plaintiff has a history of chronic back pain, apparently dating back to at least 2011.  (*Id.* at 324; *see also id.* at 64-65.)  The records suggest that she may have had some early benefits from physical therapy, but that in October of 2015, she reported a relapse of severe back pain. (*Id.* at 324.)  On October 1, 2015, Plaintiff saw her primary care physician, Dr. Muhammad Chowdhury, who prescribed pain medicine and a muscle relaxant, and referred Plaintiff to an orthopedic and pain management specialist.  (*Id.*)  Plaintiff, however, reported that she continued to have persistent pain and was unable to walk around or stand up.  (*Id.*)  On October 8, 2015, Plaintiff presented to the Emergency Department of St. Luke's Cornwall Hospital for the pain in her lower back, radiating down her right leg.  (*Id.* at 317-22.)  She stated that she could not recall any precipitating factor, but that she woke up and felt severe pain when trying to get out of bed. (*Id.* at 324.)  Dr. Chowdhury admitted Plaintiff to the hospital.  (*Id.* at 321-22.)  A musculoskeletal exam showed positive results, bilaterally, on a straight leg raise test[4] and that

---

[4] "The straight leg raise test, also called the Lasegue test, is a fundamental neurological maneuver during the physical examination of the patient with lower back pain aimed to assess the sciatic compromise due to lumbosacral nerve root irritation."  Willhuber, Gaston O.C., Piuzzi, Nicolas S., *Straight Leg Raise Test*, NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION,https://www.ncbi.nlm.nih.gov/books/NBK539717/#:~:text=GO%2C%20Piuzzi%20NS.-,Introduction,was%20first%20described%20by%20Dr. (accessed Sept. 21, 2020).

Plaintiff had pain with movement from lying down to sitting.  (*Id.* at 319.)  Plaintiff's MRI

results were recorded as follows:

> 1. Large broad-based left paracentral disc herniation[5] encroaches upon both S1 nerve roots, left greater than right, with mild central stenosis[6] at L5-S1; 2. Right paracentral/foraminal protrusion at L4-L5 encroaches upon the right L5 and right exiting L4 nerve roots; 3. Mild exaggerated lordosis[7] without acute fracture or pars defect."[8]

(*Id.* at 345-46.)  Dr. Chowdhury wrote in the Emergency Department records that Plaintiff was

"[u]nable to ambulate," that she had "[s]evere disabling back pain with radiculopathy," that her

"pain [was] refractory with oral medications," and that she had "chronic back pain [that had

been] stable until [the prior] week," but that, since then, Plaintiff's pain was "not getting

controll[ed] with oral medications."  (*Id.* at 323.)  Dr. Chowdhury also stated, in an Assessment

and Plan, that Plaintiff had "suddenly developed severe pain in the low back . . . and [was] not

getting better at all with the pain management as well as steroid."  (*Id.* at 325.)

---

[5] "The bones (vertebrae) that form the spine in your back are cushioned by spongy discs . . .  When these discs are damaged, they may bulge or break open, and are referred to as herniated discs."  *Lumbar Herniated Disc*, UNIVERSITY OF MICHIGAN SCHOOL OF MEDICINE, https://www.uofmhealth.org/health-library/hw226016 (accessed Sept. 21, 2020).

[6] Spinal stenosis occurs "when the small spinal canal, which contains the nerve roots and spinal cord, becomes compressed.  This causes a 'pinching' of the spinal cord or nerve roots, which leads to pain, cramping, weakness, or numbness."  *Spinal Stenosis*, AMERICAN COLLEGE OF RHEUMATOLOGY, https://www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Spinal-Stenosis (accessed Sept. 21, 2020).

[7] Lordosis is the "inward curve" of the lumbar spine.  Jenna Fletcher, *What is lordosis and what causes it?*, MEDICAL NEWS TODAY, https://www.medicalnewstoday.com/articles/lordosis (accessed Sept. 21, 2020).

[8] A pars defect is a stress fracture.  *Spondylolysis*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/spondylolysis (accessed Sept. 21, 2020).

While in the hospital, Plaintiff was seen by Dr. Juan Cuartas, an orthopedist;

Dr. Syed Nasir, a neurologist; and Dr. Syed Hosain, a pain-management specialist.  (Pl. Mem.,

at 4; *see also* R. at 331-40.)  Dr. Cuartas noted that Plaintiff's pain was "mostly axial pain due to

the injured and abnormal disc at 5-1."  (R. at 331.)  He further indicated that Plaintiff's treatment

in the past had included "[NSAIDs,] narcotics[,] and relaxants" in addition to "oral steroids."

(*Id.* at 327.)  Dr. Nasir noted that Plaintiff's outpatient MRI "show[ed] no change from 2011,"

and that Plaintiff's pain was worse with movement.  (*Id.* at 333.)  Dr. Hosain indicated that

analgesic medications were likely to be of little help, and that, while muscle relaxants were

prescribed, physical modalities would be more effective in the long term.  (*Id.* at 340.)

Plaintiff was kept on bedrest and was administered intravenous pain medication, muscle

relaxants, an NSAID, and an intravenous steroid.  (*Id.* at 341.)  Plaintiff gradually improved and

was able to move around, albeit "with pain," and was discharged on October 11, 2015, with

medication.  (*Id.*)

On October 13, 2015, Plaintiff saw a physiatrist, Dr. Rakesh Patel, at Crystal Run

Healthcare ("Crystal Run").  (*Id.* at 389.)  Dr. Patel reported that Plaintiff had had lower back

pain since 2011, but denied any inciting event, such as "trauma, [a] fall, [or an] accident," and

also reported "heavy lifting for her work (CNA)."  (*Id.*)  He wrote that Plaintiff's "[p]ain [was]

progressively worse over the years, with recent severe exacerbation limiting work duties," and

that Plaintiff had "limited ambulation due to pain" and had a "cane at home."  (*Id.*)  He further

reported that Plaintiff was "[i]ndependent in most ADL [activities of daily living]," but

"require[d] assistance for lower body dressing."  (*Id.*)  Dr. Patel prescribed Oxycodone[9] and

Gabapentin,[10] and referred Plaintiff to a pain-management specialist at Crystal Run,

Dr. Thomas Booker, for epidural injections.  (*Id.* at 392.)

Plaintiff went to Dr. Chowdhury for a follow-up appointment on November 19, 2015.

(*Id.* at 462.)  Dr. Chowdhury reported that, at that point, Plaintiff was "using a walking cane []

for back pain," which "still radiate[d] to the back of the thigh as well as leg" and was then

"radiating up to the back of knee."  (*Id.* at 462-63.)

Plaintiff saw Dr. Patel for follow-up appointments on December 8, 2015 and January 7,

2016.  (*Id.* at 364-76.)  He noted that Plaintiff had recently been in the hospital for pain and had

been provided Oxycontin.[11]  (*Id.* at 371.)  He noted that her pain level was a "7/10," and that her

pain was "exacerbated by bending forward, [with] no relieving factors."  (*Id.* at 372.)  He further

---

[9] Oxycodone is a "semi-synthetic opioid drug prescribed for pain."  *Oxycodone*, UNITED STATES DRUG ENFORCEMENT ADMINISTRATION, https://www.dea.gov/factsheets/oxycodone (accessed Sept. 21, 2020).

[10] Gabapentin is an anti-epileptic drug that "affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain."  *Gabapentin*, UNIVERSITY OF MICHIGAN SCHOOL OF MEDICINE, https://www.uofmhealth.org/health-library/d03182a1 (accessed Sept. 21, 2020).

[11] Oxycontin is "a strong prescription medication that contains an opioid (narcotic) that is used to manage pain severe enough to require daily around-the-clock, long-term treatment with an opioid, when other pain treatments such as non-opioid medicines or immediate-release opioid medicines do not treat your pain well enough or you cannot tolerate them."  *Oxycontin Medication Guide*, FOOD AND DRUG ADMINISTRATION, https://www.fda.gov/media/78453/download (accessed Sept. 21, 2020).

noted that Plaintiff had been "prescribed Vicodin[12] and Naproxen[13] by Dr. [C]howd[h]ury without relief."  (*Id.*)  Dr. Patel's paperwork states that Plaintiff's MRI was "suggestive of significant disc herniations at multilevels with R > L neural impingement."  (*Id.* at 375.)

At some point seemingly around this time, Dr. Chowdhury completed a questionnaire for the SSA.[14]  (*Id.* at 356-62.)   In his responses, Dr. Chowdhury indicated that Plaintiff could not bend down or tie her shoes.  (*Id.* at 356.)  He further indicated that Plaintiff's condition was "guarded."  (*Id.*)  With respect to Plaintiff's functional limitations, he opined that Plaintiff could lift and carry five pounds, stand and/or walk for less than two hours per day, and sit for less than six hours per day.  (*Id.* at 357.)

On February 3, 2016, Plaintiff saw Dr. Booker for an evaluation of her pain.  At that time, Plaintiff described her pain as "7/10."  (*Id.* at 623.)  Dr. Booker noted that Plaintiff's "pain [was] alleviated with walking, sitting, and standing," but "exacerbated with ADLs."  (*Id.*)  He noted that Plaintiff used to get injections for her back pain but that those injections only gave her relief for one month, and that she was not able to do physical therapy because it was too painful. (*Id.* at 623.)  He recommended epidural steroid injections.  (*Id.* at 625.)

---

[12] Vicodin is a prescription opioid prescribed for pain.  *What Are Opioids?*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/opioids/what-are-opioids.html (accessed Sept. 21, 2020).

[13] Naproxen is a non-steroidal anti-inflammatory drug (NSAID) with "anti-inflammatory, antipyretic and analgesic activities." *Naproxen*, NATIONAL INSTITUTE OF HEALTH, https://pubchem.ncbi.nlm.nih.gov/compound/Naproxen (accessed Sept. 21, 2020).

[14] It is not clear from the record the date on which Dr. Chowdhury completed or submitted the SSA questionnaire.

Plaintiff then saw Dr. Chowdhury again on February 16, 2016, at which time he recorded Plaintiff's "persistent back pain with discopathy"[15] and "right-sided radiculopathy."[16]  (*Id.* at 467-68.)  He also noted that Plaintiff had been given a steroid injection, and that, while her level of pain in her right leg increased after the procedure, the pain was controlled with Percocet.[17] (*Id.*)

Plaintiff saw Dr. Patel on February 23, 2016.  (*Id.* at 615.)  Dr. Patel reported limited range of motion of Plaintiff's back and lower extremities due to pain.  (*Id.* at 616.)  He also reported that Plaintiff was experiencing back pain, joint pain, and weakness and numbness in extremities.  (*Id.* at 617.)  At that visit, Plaintiff described her pain level as "5/10" and reported that the medications were helping.  (*Id.* at 615.)  Dr. Patel reiterated that Plaintiff's MRI was suggestive of "significant disc herniations at multilevels with right greater than left neural impingements."  (*Id.* at 615-19.)

Plaintiff saw Dr. Howard Yeon[18] on April 1, 2016.  (*Id.* at 606.)  Dr. Yeon noted that Plaintiff had been referred to him by Dr. Booker, after Plaintiff's "initial cortisone injection was not helpful."  (*Id.*)  In his notes, Dr. Yeon recorded:  "Lumbar radicular symptoms, low back

---

[15] Discopathy is a disc disease caused by degeneration of intreverteral discs.  Margeaux Boisson, *et al.*, *Active discopathy: a clinical reality*, NATIONAL INSTITUTE OF HEALTH, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5905838/ (accessed Sept. 21, 2020).

[16] Radiculopathy describes a range of symptoms produced by the pinching of a nerve root in the spinal column.  *Radiculopathy*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (accessed Sept. 21, 2020).

[17] Percocet is a "combined medication . . . used to help relieve moderate to severe pain."  Percocet contains an opioid pain reliever and a non-opioid pain reliever.  *Percocet*, WEBMD, https://www.webmd.com/drugs/2/drug-7277/percocet-oral/details (accessed on Sept. 21, 2020).

[18] The Record does not provide information regarding Dr. Yeon's area of specialization.

pain[,] however without clear impingement on MRI[;] disc herniation at L5-S1 appears mostly central without significant canal compromise[.]  [W]ould not recommend decompressive surgery at this point."  (*Id.* at 607.)

On April 27, 2016, Plaintiff saw Dr. Booker with a new complaint of pain running along the outside of her right hip and told him she was getting progressively worse at ambulating.  (*Id.* at 599.)  She described her pain as a "10/10."  (*Id.*)  Dr. Booker noted that Plaintiff had not obtained complete relief from injections or medications and recommended a percutaneous disc decompression.[19]  (*Id.* at 599-601.)

On September 29, 2016, Dr. Booker performed the percutaneous disc decompression surgery.  (*Id.* at 676-78.)  Plaintiff returned for a post-surgery follow-up appointment on November 19, 2016.  (*Id.* at 549.)  At that point, Dr. Booker reported that Plaintiff's back pain had not been fully relieved after the disc decompression and that her pain level was "7/10."  (*Id.*)  Plaintiff described her pain as "aching and stabbing" and stated that she had experienced relief for two weeks following the procedure, but that her pain had then returned.  (*Id.* at 549.)  Dr. Booker directed Plaintiff to take Oxycodone and begin a course of physical therapy.  (*Id.* at 550.)  Plaintiff returned to Dr. Booker on February 2, 2017, at which time she described her pain as "throbbing" and assessed her pain level as "8/10."  (*Id.* at 537.)  Dr. Booker's notes state that Plaintiff had "pain in her back and right leg from a foraminal/paracentral HNP[20] at L45[,] as well

---

[19] Percutaneous disc decompression is a "minimally invasive" treatment for disc herniation.  B. Schenk, *et al.*, AMERICAN JOURNAL OF NEURORADIOLOGY, January 2006, available at: http://www.ajnr.org/content/27/1/232.

[20] HNP stands for "herniated nucleus pulposus."  Jacky T. Yeung, *et al.*, *Cervical disc herniation presenting with neck pain and contralateral symptoms: a case report*, JOURNAL OF MEDICAL CASE REPORTS, June 2012, available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3411405/.

as central bulging at L5S1, which was not fully relieved with her disc decompression."  (*Id.* at 538.)  Dr. Booker ordered an MRI and consulted with Dr. Yeon for surgical options.  (*Id.*)

Plaintiff received an MRI on February 9, 2017, which revealed "no acute fractures," but did show "mild degenerative changes of the lower lumbar spine" and an "annular fissure at L5/S1."[21]  (*Id.* at 666-67.)

Plaintiff saw Dr. Yeon again on February 13, 2017.  (*Id.* at 534.)  Dr. Yeon noted that the updated MRI showed an annular tear at L5-S1, without significant lateral recess[22] or canal impingement.  Dr. Yeon advised against a second spinal surgery and recommended Plaintiff as a possible candidate for a spinal cord stimulator ("SCS").  (*Id.*)

Plaintiff saw Dr. Kenneth Hansraj[23] on April 12, 2017.  (*Id.* at 657.)  Dr. Hansraj noted, at that visit, that Plaintiff was limping on the right side, that her range of motion of the cervical spine was "limited," and that her range of motion of the lumbar spine was "grossly limited and with pain."  (*Id.* at 657-61.)

On August 1, 2017, Dr. Booker implanted a trial SCS.  (*Id.* at 649-50.)  On August 3, 2017, Plaintiff saw Dr. Booker for follow-up, and he noted that Plaintiff was "doing well with her SCS trial" and was "getting excellent coverage of her back and leg pain."  (*Id.* at 736.)  At Plaintiff's next appointment on August 7, 2017, Dr. Booker again noted that she was doing well

---

[21] An annular fissure or tear is a "deficiency of one or more layers of the annulus fibrosus," part of an intervertebral disc. Steven Tenny, Christopher C. Gillis, *Annular Disc Tear*, NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, https://www.ncbi.nlm.nih.gov/books/NBK459235/ (accessed Sept. 25, 2020).

[22] Lateral recess is a condition in which openings in the spinal column narrow, "impinging on or 'pinching' the spinal nerve roots."  *Lateral Recess/Foraminal Stenosis*, NORTHWEST MEDICAL CENTER, https://nw-mc.com/lateral-recessforaminal-stenosis/ (accessed on Sept. 25, 2020).

[23] The Record does not provide information regarding Dr. Hansraj's area of specialization.

and that she "report[ed] 100% relief of her pain with her SCS." (*Id.* at 734.)  He stated that

Plaintiff "ha[d] been able to sleep better and [was] walking more distances," and that "she ha[d]

been able to stand at her sink longer doing dishes." (*Id.*)  Dr. Booker recommended that an SCS

be permanently implanted. (*Id.* at 735.)

A permanent SCS was then implanted on September 25, 2017 (*id.* at 300-03), after which

Plaintiff apparently again reported beneficial results.  Specifically, on October 11, 2017,

Dr. Booker again noted that Plaintiff  had been doing well with her SCS (*id.* at 731), and, upon a

physical examination, he made findings that Plaintiff had a "[n]ormal gait and stride," with "[n]o

antalgia,"[24] a "[n]ormal heel toe progression," a "[n]ormal heel-walk and toe-walk," and

generally full strength in her lower extremities (*id.* (noting only "[t]race weakness right leg")).  It

appears that, as of October 11, 2017, Dr. Booker started Plaintiff on Amitriptyline,[25] although

the purpose of this prescription is unclear.  In a note addressed "To Whom It May Concern,"

Dr. Booker also wrote, at that time, that Plaintiff "may return to work on 10/25/2017," but with

the following restrictions:  "no bending, lifting or twisting for 3 months." (*Id.* at 733.)  He

added, "If you require additional information please contact the office." (*Id.*)  Dr. Booker

apparently directed Plaintiff to return for a follow-up visit one week later (*see id.* at 732), but the

---

[24] Antalgia refers to an abnormal walking pattern secondary to pain usually relating to a disorder of the lower back or lower extremity.  Nadja Auerbach, Prasanna Tadi, *Antalgic Gait in Adults*, NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, https://www.ncbi.nlm.nih.gov/books/NBK559243/ (accessed Sept. 25, 2020).

[25] Amitriptyline is generally used to treat symptoms of depression.  *See* https://medlineplus.gov/druginfo/meds/a682388.html#why (accessed Sept. 27, 2020).  It has, however, apparently also been used for other purposes, including for the treatment of neuropathic pain.  *See* https://www.cochrane.org/CD008242/SYMPT_amitriptyline-neuropathic-pain-adults (accessed Sept. 27, 2020).

Record does not contain any further records from Dr. Booker, or from any of Plaintiff's other doctors who had treated her for back pain.

2.      **Evidence From the Relevant Period**

As noted above, the period now at issue commenced on October 26, 2017, a date after which there is scant medical evidence in the Record, and none that relates directly to Plaintiff's history of back pain and related treatment.  Indeed, the only medical notes in the Record for the period now under review by the Court relate to an October 31, 2017 consultation that Plaintiff had with Dr. Katherine Kim at Crystal Run (upon referral by Dr. Booker), for abdominal pain that had reportedly begun two weeks earlier.  (*See id.* at 728.)  While, upon examination, Dr. Kim noted Plaintiff as being "negative" for back pain (*id.* at 729), this was plainly not the focus of her exam.  Dr. Kim ordered an abdominal CT scan, which Plaintiff underwent on November 1, 2017 (*id.* at 740), and, on November 13, 2017, she informed Plaintiff results of the CT scan were normal (*id.* at 727).

The Record does not contain any medical records dated after November 13, 2017.

C.      **Plaintiff's Testimony Before the ALJ**

On October 19, 2017, Plaintiff testified via teleconference at the Hearing before the ALJ, represented by Gary Dougherty, Esq., of the law firm Drake Loeb PLLC.  (*Id.* at 31; *see also id.* at 99.)  Plaintiff testified that the last time she worked had been in June of 2017 as a part-time "sitter" for the elderly.  (*Id.* at 37-38.)  She stated that she would go to her clients' homes and assist with "feeding, cooking, [and] washing them down."  (*Id.* at 38.)  She stated that she had

worked approximately 20 hours a week and had stopped working in June because she "just couldn't work anymore." (*Id.* at 37.)

With respect to her activities at home, Plaintiff testified that she cooked and would wipe off the table, but did not generally do any other cleaning around the house because her children did all the cleaning. (*Id.* at 38.) She testified that she drove and used "medical transportation" to get around. (*Id.* at 38-39.)

Plaintiff testified that she had undergone the decompression surgery on her back in September 2016. (*Id.* at 40.) Prior to September of 2016, she had received cortisone shots, epidurals, and physical therapy. (*Id.*) She testified that, after receiving the decompression surgery, it took a long time before she felt relief for the pain in her legs, but that her pain did improve months after the surgery. (*Id.* at 40-41.)

The ALJ asked Plaintiff whether the SCS helped with her symptoms, and she responded that the SCS "relieve[d] it, but not 100%," and that she still had some pain. (*Id.* at 41.) The ALJ then asked how Plaintiff would describe her pain with the SCS, as compared to before its implantation. Plaintiff responded, "it's like the same. Some days I have good days. Some days I have bad days. It's not always working for me." (*Id.* at 42.) She clarified that, before the SCS was implanted, she had pain in both her back and her legs, but, with the SCS, the pain was only in her back. (*Id.*) Plaintiff testified that she was also having a problem with her left hand. (*Id.* at 44.) She testified that it "won't close all the way," and that "they're running tests and MRIs trying to figure out what's going on with my hand." (*Id.*) The ALJ asked Plaintiff if there was anything else she wanted to tell him regarding her inability to work. (*Id.* at 46.) Plaintiff responded, "[I] can't sit down for long . . . can't stand up for long. I can't bend over. I will

never be able to tie my shoe.  My kids have to do all that for me.  There's a lot of stuff I just can't do."  (*Id.*)

Plaintiff's attorney then questioned Plaintiff about her limitations.  (*Id.* at 47-50.)  He asked her if she made every meal at home, and she responded that she did not.  In this regard, she testified, "I will like cook, not a big meal, but just cook little things or cook and then sit down, get up and try and cook and sit down, get up and sit down."  (*Id.* at 47.)  In response to counsel's seeking to confirm that it was "not like [she would] just go into the kitchen and whip up a meal," Plaintiff responded, "No, it's not that easy, no . . . [b]ecause I can't, when I go and try to cook . . . I can't stand up for long at the stove . . . and I have to go in the living room and sit down and then get back up and try and finish and then sit down."  (*Id.* at 47.)  Plaintiff further testified that, before the SCS was implanted, her pain level (out of 10) was always "between eight and nine" (*id.*), and that, after the implantation, her pain level was at a "six."  (*Id.* at 48.)  She testified that she still could not bend over, sit down for long, stand up for long, or take a long walk.  (*Id.*)  She testified, "I just can't do nothing I used to do before."  (*Id.* at 50.)

### D.   The VE's Testimony Before the ALJ

As noted above, the ALJ also heard testimony at the Hearing from VE Morocco.  (*Id.* at 50-55.)  The VE testified that Plaintiff's past work as a CNA had a Specific Vocational Preparation ("SVP") [26] level of 4, defined as, and performed at, a medium exertional level.  (*Id.*

---

[26] The DOT has been replaced by an online database called the Occupational Information Network or the O*NET.  *Brooks v. Comm'r of Soc. Sec.*, 207 F. Supp. 3d 361 (S.D.N.Y. 2016).  The O*NET defines SVP as the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Id.* at n.4 (internal citations and quotations omitted).  While a position with an SVP of 1 "requires training time of only a short demonstration," a job with an SVP of 2, by contrast, "requires anything beyond a short demonstration up to and including one month."  *Id.* (internal quotation marks and citation omitted.)  A position with an SVP of 4

at 51.)  The VE further testified that Plaintiff's past job as a warehouse worker had an SVP of 2, and that her past job as a home health aide had an SVP of 3, both similarly defined as, and performed at, the medium exertional level.  (*Id.*)

The ALJ asked the VE whether jobs were available for a hypothetical person of Plaintiff's age, education, and work experience, with the residual functional capacity ("RFC") "to do the full range of sedentary work," who would be "limited to occasional climbing of ramps and stairs," and "limited to frequent handling and fingering . . . ."  (*Id.* at 52.)  The VE testified that such a hypothetical person could do the work of, for example, a "taper," a "charge account clerk," or an "order clerk for food or beverage," each of which have an SVP of 2 and were categorized at sedentary exertional level.  (*Id.* at 52-53.)

The ALJ asked the VE to confirm that the hypothetical individual would be precluded from all work, if that individual were further limited to being able to "sit for four hours and stand or walk for one hour," and the VE responded, "That is correct, Your Honor . . . [t]hat is what is commonly referred to as work in sedentary and it precludes competitive employment."  (*Id.* at 53.)  The ALJ also sought to confirm that the hypothetical individual would be precluded from all work, if that individual were to be "off task for 15% of the workplace in the alternative due to pain or any other condition . . . in addition to regularly scheduled breaks," and the VE again responded, "That's correct."  (*Id.*)

**E.**    **The Current Action and the Motions Before the Court**

Represented by counsel, Plaintiff filed the Complaint in this action on February 13, 2019. (Dkt. 1).

---

requires over 3 months up to and including 6 months.  *Silvestro v. Astrue*, No. 07cv9554 (VB) (LMS), 2011 WL 5142754, at n.5 (S.D.N.Y. Aug. 23, 2011).

On September 10, 2019, Plaintiff filed a motion for Judgment on the Pleadings, seeking reversal of the Commissioner's decision.  (*See* Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Administrative Record and Pleadings Pursuant to Rule 12(C) F.R.C.P., dated Sept. 10, 2019 ("Pl. Mem.") (Dkt. 17).)  In her motion, Plaintiff generally argued that the ALJ's medical improvement analysis was not supported by substantial evidence, that the Commissioner had failed to show that Plaintiff was able to engage in substantial gainful activity, and that the ALJ had erred in discounting Plaintiff's testimony regarding the extent of her pain and limitations.  (*See id.* at 10-25.)

On November 12, 2019, Defendant opposed Plaintiff's motion and filed a cross-motion for judgment on the pleadings in favor of the Commissioner, supported by a memorandum of law (Memorandum of Law in Response to Plaintiff's Motion for Judgment on the Pleadings and in Support of the Commissioner's Cross-Motion, dated Nov. 12, 2019 (Dkt. 20).)  In his submission, Defendant contended that the ALJ had properly evaluated the medical evidence and Plaintiff's symptoms in determining her RFC as of October 26, 2017, and that the ALJ's decision that she was not disabled after that date was supported by substantial evidence.  (*See id.* at 18-25.)

Plaintiff filed a reply brief on December 3, 2019.  (Plaintiff's Reply Memorandum of Law in Opposition to Defendant's Cross Motion and in Further Support of Plaintiff's Motion for Judgment on the Administrative Record and Pleadings Pursuant to Rule 12(C) F.R.C.P., dated Dec. 3, 2019 (Dkt. 21).)  On reply, Plaintiff particularly challenged Defendant's contention that the ALJ's decision was adequately supported by Dr. Booker's opinion that Plaintiff could return to work, when the ALJ had rejected the same doctor's opinion regarding Plaintiff's functional limitations.  (*See id.* at 1.)  Plaintiff also reiterated her earlier arguments regarding the

17

alleged flaws in the ALJ's consideration of Plaintiff's testimony and his application of the medical improvement standard.  (*See id.* at 2-3.)

## DISCUSSION

## I.  APPLICABLE LEGAL STANDARDS

### A.  Judgment on the Pleadings

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id.* (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final, provided that the correct legal standards are applied and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  "[W]here an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ."  *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted)).  Thus, the first step is to ensure that the Commissioner applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  In making this determination, a court must consider the underlying record.  The reviewing court does not, however, decide *de novo* whether a claimant is disabled.  *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997).  Thus, if the correct legal principles have been applied, the Court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming decision where substantial evidence supported both sides).

### B.   The Five-Step Sequential Evaluation

To be entitled to disability benefits under the Act, a claimant must establish his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  An individual is considered disabled only if the individual's physical or mental impairments are of such severity that he or she is not only unable to do his or her previous work, but also cannot, considering his

or her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). Throughout the inquiry, the ALJ must consider four primary sources of evidence:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If not, at the second step, the ALJ determines whether the claimant has a "severe" impairment or combination of impairments that significantly limits his or her physical or mental ability to do basic work activities.  *Id.* §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c).  If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience."  *Id.* §§ 404.1520(d), 416.920(d).

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the record, the claimant's RFC, or ability to perform physical and mental work activities on a sustained basis.  *Id.* §§ 404.1545, 416.945.  The

ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past relevant work." *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether, in light of the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy. *Id.* §§ 404.1520(a)(4)(v), (g), 416.920(a)(4)(v), (g).

On the first four steps of the five-step evaluation, the claimant generally bears the burden of establishing facts to support his or her claim.  *See Berry*, 675 F.2d at 467 (citation omitted). At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).  To support a finding that a claimant is not disabled, the Commissioner must provide evidence showing that, given the claimant's RFC and vocational factors, the claimant is capable of performing work that exists in significant numbers in the national economy.  *See* 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2).  The Commissioner must also establish that the alternative work "exists in significant numbers" in the national economy and that the claimant can perform this work, given his or her RFC and vocational factors. *Id.* §§ 404.1560(c)(2), 416.960(c)(2).  In making such a finding, an ALJ may rely on a vocational expert's testimony concerning the availability of jobs suited to a hypothetical person with the claimant's capabilities, "as long as the facts of the hypothetical are based on substantial evidence and accurately reflect the limitations and capabilities of the claimant involved." *Sylcox v. Colvin*, No. 14cv2161 (PAC) (HBP), 2015 WL 5439182, at *16 (S.D.N.Y. Sept. 15, 2015) (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983); *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)).

C.    **The Medical Improvement Standard**

Even where a claimant had been found to be disabled, he or she may later be found to be no longer disabled, where substantial evidence of "medical improvement" supports the conclusion that the claimant has become able to work.  *See* 42 U.S.C. § 423(f)(1); *Veino*, 312 F.3d at 586; *Hathaway v. Berryhill*, 687 F. App'x 81, 83 (2d Cir. 2017) (summary order) ("[Where] the individual's condition has 'improve[d] to the point where he or she is able to engage in substantial activity' . . . benefits are no longer justified, and may be terminated by the [Commissioner]." (citing *De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 937 (2d Cir. 1984))).

The regulations define medical improvement as "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [he or she was] disabled or continued to be disabled."  20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i).  To determine whether a claimant's medical condition has improved, "the SSA must compare 'the current medical severity of th[e] impairment [ ] . . . to the medical severity of that impairment[ ] at th[e] time' of the most recent favorable medical decision."  *Veino*, 312 F.3d at 586-87 (quoting 20 C.F.R. § 404.1594(b)(7) (alteration in original)); *see Crowell v. Astrue*, No. 08cv8019 (LTS) (DF), 2010 WL 7765355, at *12 (S.D.N.Y. Jul. 23, 2010) ("'the relevant inquiry is whether plaintiff's condition improved from the date of the most recent decision in his favor' (citation omitted)") (citing *Fleming v. Sullivan*, 806 F. Supp. 13, 15 (E.D.N.Y.1992)).

 "[A] determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the claimant's] impairment(s)."  20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i).

An ALJ's determination as to whether a claimant has experienced a medical improvement so as to qualify for SSDI benefits should be made using an eight-step procedure set forth in the relevant regulation, whereas the determination as to whether a claimant has experienced medical improvement so as to qualify for SSI benefits should be made using a seven-step procedure.  *See id.* §§ 404.1594(f)(1)-(8), 416.994(b)(5)(i)-(vii); *Abrams v. Astrue*, No. 06 Civ. 0689 (JTC), 2008 WL 4239996, at *2 (W.D.N.Y. Sept. 11, 2008) ("The Commissioner has the burden of persuasion to demonstrate medical improvement, in accordance with the eight-step sequential evaluation process set forth in the regulations" (citations omitted)); *Chavis v. Astrue*, No. 07 Civ. 0018 (LEK), 2009 U.S. Dist. LEXIS 125144, at *15-17 (N.D.N.Y. Dec. 2, 2009) (Report & Recommendation) (applying eight-step procedure listed in 20 C.F.R. § 404.1594(f)), adopted by, 2010 WL 624039 (N.D.N.Y. Feb. 18, 2010).

Similar to the five-step process used for determining disability, as outlined above, the eight-step medical improvement standard for SSDI benefits first asks the ALJ to determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 404.1594(f)(1).  For an SSI claim, the performance of substantial gainful activity is not a factor used to determine medical improvement.  *See id.* § 416.994(b)(5).

If the claimant has not engaged in substantial gainful activity, then Step Two for an SSDI assessment and Step One for an SSI assessment require the ALJ to consider whether the claimant has an impairment that meets or equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant has such an impairment, then the claimant's disability will be found to continue.  *See id.* §§ 404.1594(f)(2), 416.994(b)(5)(i).

If the claimant does not suffer from such an impairment, then Step Three for an SSDI assessment and Step Two for SSI assessment require the ALJ to determine whether there has

been medical improvement as defined by paragraph (b)(1) of this section of the regulations.  *See id.* §§ 404.1594(f)(3), 416.994(b)(5)(ii).

If there has been medical improvement, then Step Four for SSDI and Step Three for SSI ask the ALJ to determine whether it is related to the claimant's ability to do work, *i.e.* whether there has been an increase in the claimant's RFC, based on the impairment that was present at the time of the most recent favorable medical determination.  *See id.* §§ 404.1594(f)(4), 416.994(b)(5)(iii).  If this step reveals no medical improvement or if the ALJ concludes at Step Four that the improvement was unrelated to the claimant's ability to work, then Step Five for SSDI and Step Four for SSI consider whether any specified exceptions apply.  *See id.* §§ 404.1594(f)(5), 416.994(b)(5)(iv).

If, however, medical improvement related to the ability to work is shown, then Step Six for SSDI and Step Five for SSI ask whether all of a claimant's current impairments in combination should be considered severe, *i.e.* whether all impairments in combination significantly limit the claimant's ability to do basic work activities.  *See id.* §§ 404.1594(f)(6), 416.994(b)(5)(v).

If the impairments are found to be severe, then Step Seven for SSDI and Step Six for SSI instruct the ALJ to assess the claimant's RFC based on all current impairments and determine whether the claimant is able to perform past relevant work.  *See id.* §§ 404.1594(f)(7), 416.994(b)(5)(vi).

Finally, if the claimant is unable to perform his or her past relevant work, then Step Eight for SSDI and Step Seven for SSI require the ALJ to determine whether the claimant is capable of performing "any other work," giving consideration to claimant's age, education, and past work

experience.  *See id.* §§ 404.1594(f)(8), 416.994(b)(5)(vii).  If a claimant can do such work, then disability will be found to have ended.  *Id.*

In simpler terms, the ALJ must first determine if there has been a medical improvement, and, if so, must go on to "determine whether the improvement is related to the claimant's ability to work."  *Wright v. Comm'r of Soc. Sec.*, No. 06 Civ. 394 (LEK) (DEP), 2008 WL 4287387, at *8 (N.D.N.Y. Sept. 16, 2008); *see also* 20 C.F.R. §§ 404.1594(b)(3), 416.994(b)(1)(iii). Basic work activities are defined as the abilities and aptitudes necessary to do most jobs, including exertional abilities such as walking, standing, pushing, pulling, reaching and carrying, and non-exertional abilities such as seeing, hearing, speaking, remembering, and using judgment. *See* 20 C.F.R. §§ 404.1594(b)(4), 416.994(b)(1)(iv).

Although the "medical improvement" standard described above is most typically applied by the SSA to determine whether benefits that have previously been granted on an open-ended basis should be terminated, it has been held that ALJs should apply the same standard in deciding whether a claimant's application warrants a finding of a closed period of disability (for which benefits should be granted), and a subsequent period of non-disability (for which benefits should be denied).  *See, e.g., Crowell*, 2010 WL 7765355, at *13 ("ALJs should apply the same [medical improvement] standard in deciding whether a claimant's application warrants a finding of a closed period of disability"); *Chavis*, 2009 U.S. Dist. LEXIS 125144, at *13-15, (surveying circuit law and concluding that the eight-step procedure for evaluating medical improvement should apply in "closed-period" disability cases); *Abrams*, 2008 WL 4239996, at *2-3 (applying medical improvement standard to closed-period disability case).

In a closed-period disability case, the claimant's impairment after that period should be compared with his or her impairment as of the disability onset date.  *Chavis*, 2009 U.S. Dist.

LEXIS 125144, at *23; *see Harrison v. Astrue*, No. 08 Civ. 106(PRC), 2009 WL 1085956, at *6

(N.D. Ind. Apr. 22, 2009) (where an ALJ finds that plaintiff is disabled for a closed period in the

same decision in which he found that a medical improvement occurred, the disability onset date

is the comparison point).

###   D.   Duty To Develop the Record

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ

generally has an affirmative obligation to develop the administrative record," *Perez v. Chater*,

77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d

751, 755 (2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Rosa v.*

*Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *accord Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d

249, 262 (S.D.N.Y. 2016) (noting that "[r]emand is appropriate where this duty is not

discharged").  Indeed, "where there are deficiencies in the record, an ALJ is under an affirmative

obligation to develop a claimant's medical history 'even when the claimant is represented by

counsel.'"  *Rosa*, 168 F.3d at 79 (quoting *Perez*, 77 F.3d at 47).

The SSA regulations explain this duty to claimants this way:

> Before we make a determination that you are not disabled, we will
> develop your complete medical history . . . [and] will make every
> reasonable effort to help you get medical reports from your own
> medical sources when you give us permission to request the
> reports. . . .  'Every reasonable effort' means that we will make an
> initial request for evidence from your medical source and, at any
> time between 10 and 20 calendar days after the initial request, if
> the evidence has not been received, we will make one follow[-]up
> request to obtain the medical evidence necessary to make a
> determination.

20 C.F.R. §§ 404.1512(b)(1), (b)(1)(i), 416.912(d), (d)(1).  "[I]f the documents received lack any

necessary information, the ALJ should recontact the treating physician."  *Oliveras ex rel.*

*Gonzalez v. Astrue*, No. 07cv2841 (RMB) (JCF), 2008 WL 2262618, at *6 (S.D.N.Y. May 30,

2008), *report and recommendation adopted*, 2008 WL 2540816 (June 25, 2008).  The ALJ also has the authority to subpoena medical evidence on behalf of the claimant, 42 U.S.C. § 405(d), but is not required to subpoena medical records if they are not received following two ordinary requests, *Gonell De Abreu v. Colvin*, No. 16cv4892 (BMC), 2017 WL 1843103, at \*5 (E.D.N.Y. May 2, 2017); 20 C.F.R. §§ 404.950(d)(1), 416.1450(d)(1).

The SSA regulations further explain that a claimant's "complete medical history" means the records of his or her "medical source(s)."  20 C.F.R. §§ 404.1512(b)(1)(ii), 416.912(d)(2).  If the information obtained from medical sources is insufficient to make a disability determination, or if the ALJ is unable to seek clarification from treating sources, the regulations also provide that the ALJ should ask the claimant to attend one or more consultative evaluations.  *Id.* §§ 404.1512(b)(2), 404.1517, 416.912(e), 416.917.  Where, however, there are no "obvious gaps" in the record and where the ALJ already "possesses a 'complete medical history,'" the ALJ is "under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5.

The question of "[w]hether the ALJ has met his duty to develop the record is a threshold question.  Before reviewing whether the Commissioner's final decision is supported by substantial evidence . . . the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record."  *Craig*, 218 F. Supp. 3d at 261-62 (internal quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g).  Further, the court must satisfy itself that the administrative record has been adequately developed, regardless of whether the issue is raised by the plaintiff.  *See Castillo v. Comm'r of Soc. Sec.*, No. 17cv09953 (JGK) (KHP), 2019 WL 642765, at \*7 (S.D.N.Y. Feb. 15, 2019) (noting that, even where the plaintiff does not argue that

an ALJ failed to develop the record, the court "is nevertheless obliged to conduct its own

independent assessment of whether the ALJ properly discharged this duty").

### E.   The Treating Physician Rule

Under the so-called "treating physician rule,"[27] the medical opinion of a treating source

as to "the nature and severity of [a claimant's] impairments" is entitled to "controlling weight,"

where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with other substantial evidence in [the] case record."

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  "Treating source" is defined as the claimant's "own

physician, psychologist, or other acceptable medical source who . . . has provided [the claimant]

with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with

him or her.  *Id.* §§ 404.1502, 416.902.  Treating physicians' opinions are generally accorded

deference because treating physicians "are likely to be the medical professionals most able to

provide a detailed, longitudinal picture" of a claimant's condition and "bring a unique

perspective to the medical evidence that cannot be obtained from the objective medical findings

alone or from reports of individual examinations, such as consultative examinations."  *Id.*

§§ 404.1527(c)(2), 416.927(c)(2); *see Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004)

(summary order).

Where an ALJ determines that a treating physician's opinion is not entitled to

"controlling weight," the ALJ must "give good reasons" for the weight accorded to the opinion.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).   Failure to "give good reasons" is grounds for

remand.  *Halloran v.  Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand

---

[27] In accordance with Revisions to Rules Regarding the Evaluation of Medical Evidence,
82 Fed. Reg. 11 (Jan. 18, 2017), the treating physician rule, as described herein, will no longer be
in effect for applications made to the SSA on or after March 27, 2017.

when the  Commissioner has not provided 'good reasons' for the weight given to a treating

physician's  opinion . . . ."). Moreover, in determining the weight to be accorded to an opinion

of a treating physician, the ALJ "must apply a series of factors," *Aronis v. Barnhart*,

No. 02cv7660 (SAS), 2003 WL 22953167, at \*5 (S.D.N.Y. Dec. 15, 2003) (citing 20 C.F.R.

§§ 404.1527(d)(2), 416.927(d)(2)[28]), including:  (1) the length of the treatment relationship and

the frequency of  examination; (2) the nature and extent of the treatment relationship, including

whether the  treatment received was particular to the claimant's impairment; (3) the

supportability of the  physician's opinion; (4) the consistency of the physician's opinion with the

record as a whole;  and (5) the specialization of the physician providing the opinion, 20 C.F.R.

§§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5); *see* Shaw, 221 F.3d at 134 (noting that these five

factors "must be considered when the treating physician's opinion is not given controlling

weight").

Even where a treating physician's opinion is not entitled to "controlling weight," it is

generally entitled to "more weight" than the opinions of non-treating and non-examining

sources.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see* SSR 96-2p (S.S.A. July 2, 1996)

("In many cases, a  treating source's medical opinion will be entitled to the greatest weight and

should be adopted,  even if it does not meet the test for controlling weight."); *see also*

*Gonzalez v. Apfel*, 113 F.  Supp. 2d 580, 589 (S.D.N.Y. 2000).  A consultative physician's

opinion, by contrast, is generally entitled to "little weight."  *Giddings v. Astrue*, 333 F. App'x

649, 652 (2d Cir. 2009) (summary order) (internal quotation marks and citation omitted).  This

is because consultative  examinations "are often brief, are generally performed without benefit

---

[28] On February 23, 2012, the Commissioner amended 20 C.F.R. §§ 404.1527 and
416.927, by, among other things, removing paragraph (c), and re-designating paragraphs (d)
through (f) as paragraphs (c) through (e).

or review of the  claimant's medical history, and, at best, only give a glimpse of the claimant on

a single day." *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) (internal quotation

marks and citations omitted).  The opinions of consultative physicians, though, "can constitute

substantial evidence in support of the ALJ's decision" when the opinion of a claimant's treating

physician cannot be obtained.  *Sanchez v. Commissioner of Social Sec.*, No. 15cv4914, 2016

WL 8469779, at *10 (S.D.N.Y. Aug. 2, 2016), *report and recommendation adopted by* 2017

WL 979056 (Mar. 13, 2017).

## F.    Assessment of a Claimant's Subjective Complaints

Assessment of a claimant's subjective complaints about his or her symptoms or the effect

of those symptoms on the claimant's ability to work involves a two-step process.  Where a

claimant complains that certain symptoms, including pain, limit his or her capacity to work, the

ALJ is required, first, to determine whether the claimant suffers from a "medically determinable

impairment that could reasonably be expected to produce" the symptoms alleged.  20 C.F.R.

§§ 404.1529(c)(1), 416.929(c)(1).  Assuming the ALJ finds such an impairment, then the ALJ

must take the second step of "evaluat[ing] the intensity and persistence of [the claimant's]

symptoms, including pain," considering "all of the available evidence," to determine "how [the]

symptoms limit [the claimant's] capacity for work."  *Id.* §§ 404.1529(c)(1), 416.929(c)(1).  In

doing so, the ALJ must consider all of the available evidence, and must not "reject [ ] statements

about the intensity and persistence of [ ] pain or other symptoms . . . solely because the available

objective medical evidence does not substantiate [the claimant's] statements."  *Id.*

§§ 404.1529(c)(2), 416.929(c)(2).  Instead, where the claimant's contentions regarding his or her

symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the

claimant's statements in relation to the objective evidence and other evidence, in order to

determine the extent to which the claimant's symptoms affect his or her ability to do basic work activities.  *Id.* §§ 404.1529(c)(3)-(4), 416.929(c)(3)-(4); *see also* SSR 16-3p.[29]

While an ALJ "is required to take [a] claimant's reports of pain and other limitations into account" in evaluating his or her statements, an ALJ is "not required to accept the claimant's subjective complaints without question."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  To the extent the ALJ determines that the claimant's statements are not supported by the medical record, however, the ALJ's decision must include "specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence," and the reasons must be "clearly articulated" for a subsequent reviewer to assess how the adjudicator evaluated the individual's symptoms.  SSR 16-3p.  The factors that an ALJ should consider in evaluating the claimant's subjective complaints, where they are not supported by objective medical evidence alone, are:  (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the symptoms; (5) any treatment, other than

---

[29] Effective on March 28, 2016, SSR 16-3p superseded SSR 96-7p, which had required the ALJ to make a finding on the credibility of the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms, where those statements are not substantiated by objective medical evidence.  *See* SSR 96-7p (S.S.A. July 2, 1996).  The new ruling, SSR 16-3p, eliminates the use of the term "credibility" from the SSA's sub-regulatory policy, in order to "clarify that subjective symptom evaluation is not an examination of an individual's character."  SSR 16-3p (S.S.A. Mar. 28, 2016).  Instead, adjudicators are instructed to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms."  *Id.*  Both the two-step process for evaluating an individual's symptoms and the factors used to evaluate the intensity, persistence and limiting effects of an individual's symptoms remain consistent between the two rulings.  *Compare* SSR 96-7p, *with* SSR 16-3p.  As the ALJ's decision in this matter was issued after the new regulation went into effect, this Court will review the ALJ's evaluation of Plaintiff's statements regarding the intensity of her symptoms under the later regulation, SSR 16-3p.

medication, that the claimant has received for relief of the symptoms; (6) any other measures

that the claimant employs to relieve the symptoms; and (7) other factors concerning the

claimant's functional limitations and restrictions as a result of the symptoms.  *See* 20 C.F.R.

§§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).

## II.     THE ALJ'S DECISION REGARDING PLAINTIFF'S "MEDICAL IMPROVEMENT"

ALJ Stacchini issued a partially favorable decision on March 21, 2018, finding that

Plaintiff was disabled from October 9, 2015 through October 25, 2017, but that medical

improvement occurred as of October 26, 2017, such that the Plaintiff was no longer disabled.

(R. at 12-23.)  The parties do not dispute the ALJ's determination that Plaintiff was disabled and

entitled to benefits from October 9, 2015 through October 25, 2017, and thus they have not

placed before this Court any issue as to the propriety of that finding.  They have, however, raised

questions as to whether the ALJ appropriately determined that, as of October 26, 2017, Plaintiff

had medically improved to the point where she was no longer unable to work.  The Court's

summary of the ALJ's decision will thus focus only on that portion the decision.

As applicable to Step One of the eight-step medical improvement evaluation relevant to

Plaintiff's claim for SSDI benefits,[30] the ALJ determined that Plaintiff had not engaged in

substantial gainful activity since October 9, 2015.  (*Id.* at 16.)

As relevant to Step Two, the ALJ found that, during the period from October 9, 2015

through October 25, 2017, Plaintiff had the severe impairments of lumbar degenerative disc

disease, asthma, anemia, a left small finger trigger finder, and hyperthyroidism (*id.*), and that she

---

[30] As discussed previously, the medical improvement analysis is largely the same for SSDI and SSI benefits, except that the first step in the analysis applies only to SSDI, and not to SSI, benefits.  (*See* Discussion, *supra*, at Section I(C).)

continued to have the same impairments for the period commencing October 26, 2017 (*id.* at 20), but none of these impairments met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*see id.*).

As relevant to Step Three of the evaluation, the ALJ found that, even though Plaintiff's RFC prior to October 26, 2017 rendered her disabled under the Act, "medical improvement" had occurred as of that date. (*See id.*)  In this regard, the ALJ noted that Plaintiff's treatment records showed "slow, but steady and significant progress in [her] symptoms." (*Id.*)  Citing Dr. Booker's notes, the ALJ also pointed out that medical records reflected that the SCS implantation "had been an effective form of treatment, providing [Plaintiff] with 100% relief of pain in her low back and lower extremities," that "she had reacquired motion to her lumbar spine and increased her ability to stand and walk distances," and that she had been "cleared to return to work as of October 25, 2017." (*Id.*)  The ALJ then found, at Step Four, that the medical improvement was related to Plaintiff's ability to work "because there ha[d] been an increase in [Plaintiff's RFC]." (*Id.* at 20-21.)

Given his determinations at Steps Three and Four, the ALJ did not need to address the specified exceptions that are relevant to Step Five. (*See* Discussion, *supra*, at Section I(C).)  As relevant to the analysis required at Step Six, he determined that Plaintiff had not developed any new impairments since October 26, 2017; that her impairments after that date were the same as the severe impairments that had been present during the period from October 9, 2015 through October 25, 2017; and that, beginning on October 26, 2017, Plaintiff had neither an impairment nor a combination of impairments that met or medically equaled a listed impairment. (R. at 20.)

As relevant to Step Seven, the ALJ assessed Plaintiff's RFC after October 26, 2017, and found that, beginning on that date, she had the RFC to perform sedentary work as defined in

20 C.F.R. §§ 404.1567(a) and 416.967(a), except that she could only "occasionally climb ramps or stairs," and could "perform no climbing of ladders, ropes, or scaffolds." (*Id*. at 21.)  In addition, he found that Plaintiff could "occasionally balance, stoop, kneel, crouch, [and] crawl," that she could "frequently perform left handling and fingering," and that she would need to "avoid concentrated exposure to atmospheric conditions, and [] extreme cold and extreme heat." (*Id.*)  Based on this RFC determination, the ALJ found that, after October 26, 2017, Plaintiff remained unable to perform her past relevant work (*id.* at 22), which, as had been noted by the VE, was all at a medium exertional level and therefore exceeded the RFC (*id.*).

In making this RFC determination, the ALJ focused on Dr. Booker's progress notes that followed Plaintiff's second SCS implantation in September 2017.  (*See id.* at 21.)  In particular, the ALJ highlighted Dr. Booker's October 11, 2017 note that stated that Plaintiff could return to work, with the restrictions of no bending, lifting or twisting for three months.  (*Id*.)  The ALJ gave "significant weight" to Dr. Booker's opinion that Plaintiff could return to work, finding this portion of the opinion to be consistent with the doctor's progress notes.  (*Id*.)  On the other hand, the ALJ assigned "little weight" to the portion of Dr. Booker's opinion that indicated that Plaintiff had continued physical restrictions, finding this portion to be inconsistent with the medical record.  (*Id*.)  The ALJ also found that Plaintiff's Hearing testimony, in which she stated that, after the SCS implantation, she continued to have "bad days," with only minor pain relief, and with symptoms that still precluded her from performing daily activities, was inconsistent with the medical evidence in the Record.  (*Id.* at 21-22.) The ALJ, however, did not explain the basis for his specific RFC determinations regarding, for example, the extent of Plaintiff's post-October 26, 2017 abilities to stoop, kneel, crouch, and crawl.

Finally, as relevant to Step Eight, the ALJ found that, beginning on October 26, 2017,

considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in

significant numbers in the national economy that the Plaintiff could have performed (*id.* at 22),

and he therefore determined that she was "not disabled" as that date (*id*. at 23).

## III.   <u>REVIEW OF THE ALJ'S DECISION</u>

In this action, although the ALJ did not enumerate the steps of the applicable eight- (or

seven-) step evaluation in assessing whether medical improvement had occurred, he nonetheless

made the findings required at each of those steps.  Thus, the initial question before this Court is

whether, in the course of that evaluation, the ALJ made any errors of law that might have

affected the disposition of Plaintiff's claim.  If the ALJ did not commit legal error, then the Court

must go on to determine whether the ALJ's determination that Plaintiff was not disabled for the

period commencing October 26, 2017 was supported by substantial evidence.

Upon review of the ALJs decision, the Court notes that, by determining that October 25,

2017 marked the end of the period of Plaintiff's disability, it is obvious that the ALJ was relying

directly on the opinion of Dr. Booker that, following Plaintiff's surgery for the permanent

implantation of an SCS device, she could return to work as of October 25, 2017, albeit with

temporary restrictions.  While it is tempting to find this reliance reasonable and the ALJ's

decision adequately supported – especially as there is plainly evidence in the Record that

suggests that Plaintiff enjoyed substantial benefits from both the trial and permanent SCS

implantations – there are three interrelated problems with doing so.  First, the ALJ did not give

good reasons for assigning only "little" weight to the portion of Dr. Booker's opinion that

Plaintiff would have certain significant functional limitations for at least three months past

October 25, 2017; second, in the face of an extremely sparse medical record following the

implantation of the permanent SCS device, the ALJ did not have a sufficient basis for generally

rejecting Plaintiff's testimony regarding the extent of the pain and limitations that she was again

experiencing after that surgery; and third, the ALJ should not have discounted portions of

Dr. Booker's opinion and essentially all of Plaintiff's testimony without first taking steps to

develop the Record, both to clarify Dr. Booker's opinion and to determine whether there was, in

fact, any medical support for the functional limitations described by Plaintiff at the Hearing.

Moreover, for the *entire* period of Plaintiff's supposed medical improvement (which

post-dated the Hearing), the Court has been presented with almost *no* pertinent medical records,

let alone any test results or medical opinion evidence that could support the ALJ's RFC

determination for that period.  Given the existing inconsistencies in the Record for the time just

prior to the relevant period, and the fact that Plaintiff's surgery only shortly preceded the Hearing

(leaving unanswered any questions regarding its longer-term effects), the ALJ should have

sought to supplement the Record with post-hearing evidence of Plaintiff's recovery, functional

capacities, and prognosis.

An ALJ has an affirmative duty to develop the record, even where the plaintiff is

counseled, and the failure to do so is grounds for remand.  *See Rosa*, 168 F.3d at 79, 82-83.

Indeed, as noted above, a plaintiff need not even raise the issue before the Court, as the Court

must independently satisfy itself that the administrative record has been sufficiently developed to

allow for meaningful judicial review.  *Castillo*, 2019 WL 642765, at *7.  In this case, the ALJ's

failure to develop the Record constituted error that hinders the Court's ability to review the

ALJ's decision and that therefore warrants remand.

A.    **The ALJ Should Have Sought Clarification of the**
      **Portion of Dr. Booker's Opinion Regarding Plaintiff's**
      **Functional Limitations, Prior to Assigning It "Little Weight."**

In her moving brief, Plaintiff points out that "the ALJ selectively cho[se] to provide great

weight to Dr. Booker's statement that [Plaintiff] was cleared to go back to work as of

October 25, 2017, while providing little weight to the limitations the doctor place[d] on her of

'no bending, lifting, or twisting for [three] months' . . . ."  (Pl. Mem., at 14.)  According to

Plaintiff, this selective reliance on Dr. Booker's opinion was improper, as an "'ALJ cannot pick

and choose evidence in the record that supports his conclusions.'"  (*Id.* (quoting *Cruz v.*

*Barnhart*, 343 F. Supp. 2d 318, 224 (S.D.N.Y. 2004).)

Even beyond any cherry picking, however, the ALJ's decision to accord different weight

to the different portions of Dr. Booker's opinion calls into question the ALJ's application of the

"treating physician rule," as Plaintiff also notes.  (*See* Pl. Mem., at 16.)  There is no doubt that

Dr. Booker qualified as Plaintiff's "treating physician."  He treated Plaintiff routinely for pain

management during the period the ALJ found her to be disabled, and he performed Plaintiff's

percutaneous disc decompression surgery (R. at 676-78), her trial SCS implant surgery (*id.* at

649-50), and her permanent SCS implant surgery (*id.* at 300-03.)  Under the treating physician

rule, as set out above, all portions of Dr. Booker's opinion that were not reserved for the ALJ

were entitled to "controlling" weight, absent an express statement of good reasons by the ALJ for

choosing to assign any lesser weight.

Here, as set out above, Dr. Booker wrote, on October 11, 2017, that Plaintiff could return

to work as of October 25, 2017, but with the restrictions of no bending, lifting, or twisting for

three months.  (*Id.* at 733.)  Although the ultimate decision as to whether a claimant is able to

work is reserved to the ALJ, *see Valdez v. Colvin,* 232 F. Supp. 3d 543, 554 (S.D.N.Y. 2017), the

ALJ nonetheless afforded "significant weight" to the portion of Dr. Booker's opinion clearing Plaintiff to return to work, as, in the ALJ's view, "it demonstrate[d] that [Plaintiff] [was] not precluded from all work activity" and "[was] consistent with records showing 100 percent relief with the SCS."  (R. at 21.)  As for the portion of Dr. Booker's opinion that was *not* reserved to the ALJ, however – *i.e.*, his opinion as to Plaintiff's functional limitations – the ALJ assigned the opinion only "little weight," on the grounds that this portion of the opinion to the portion of Dr. Booker's opinion was "not consistent with any of the physician's progress notes or treatment records, even prior to implant[t]ation of the SCS, which fail[ed] to support such a high degree of debilitation."  (*Id.* at 21.)  The Court is not persuaded that these constituted "good reasons" for rejecting Dr. Booker's functional assessment.

First of all, it is incorrect that the medical evidence predating the implantation of the SCS "fail[ed] to support" that Plaintiff, pre-surgery, had such limitations.  For example, in his SSA questionnaire, Dr. Chowdhury stated that Plaintiff could not bend down, tie her shoes, twist around, or carry any weight (*id.* at 356-62); on February 3, 2016, Dr. Booker reported that Plaintiff had decreased range of motion and was not able to go to physical therapy because of the pain (*id.* at 623-25); on February 23, 2016, Dr. Patel reported that Plaintiff had a limited range of motion due to pain (*id.* at 615-19); on April 27, 2016, Dr. Booker noted that Plaintiff had become "progressively worse at ambulating" (*id.* at 599-601); and, on April 12, 2017, Dr. Hansraj noted Plaintiff's limping gait, limited range of motion of the cervical spine, "grossly limited" range of motion of the lumbar spine, and decreased range of motion in both of her shoulders (*id.* at 657-61).  In fact, for the period predating Plaintiff's SCS implantation, the ALJ actually found that Plaintiff was so significantly impaired as to have been disabled under the Act.

Second, to the extent the ALJ perceived Dr. Booker's October 11, 2017 statements regarding Plaintiff's functional restrictions as inconsistent with the few progress notes in the Record that post-dated the SCS procedures, the ALJ had an obligation clarify that perceived inconsistency. *See Gerace v. Astrue*, No. 07-CV-0028 (MAT), 2008 WL 4372652, at *8 (W.D.N.Y. Sept. 19, 2008) ("[T]he duty to develop the record includes an obligation to clarify any perceived inconsistencies in the report of a treating physician."); *see also Rosa*, 168 F.3d at 79 ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." (citing *Hartnett v. Apfel*, 21 F. Supp. 2d 217 (E.D.N.Y. 1998))).  Even if, upon clarification, the ALJ had learned that Dr. Booker had urged limitations on Plaintiff's physical movements for a three-month period purely for the purpose of safeguarding her full post-surgical recovery, and not because he had concerns that she would experience pain upon bending, lifting, or twisting, such medical guidance from Plaintiff's treater may well have led the ALJ to extend, for an additional three months, the period for which he found her entitled to benefits.

Third, as discussed further below, there is an obvious gap in the Record with respect to the "medical improvement" period actually under review.  While the ALJ had before him at least a handful of treatment records following Plaintiff's initial and subsequent SCS procedures, the most recent of those – from *any* provider who treated Plaintiff for her back pain – was from October 11, 2017, only about two weeks after the permanent SCS implantation, and *prior to* the start of the period for which the ALJ found Plaintiff able to work.  The Record does not indicate whether, from October 26, 2017 forward, Plaintiff had any further follow-up visits with

Dr. Booker,[31] or, for that matter, with any of the other doctors with whom she had long-standing treatment relationships.  Except for the very narrow window of time immediately following the SCS procedures, there are no recorded clinical observations regarding Plaintiff's ability to sit, stand, ambulate, flex, or bend, and there seem to be no post-operative test results, at all, demonstrating Plaintiff's range of motion and the presence or absence of radiculopathy.  The Record is also unclear regarding the extent to which Plaintiff's prior regimen of pain medication was maintained, adjusted, altered, or discontinued during the period under review by the Court.  Under these circumstances – where, for the relevant period, there are essentially *no* meaningful progress notes or other clinical treatment records – it cannot be said that such records fail to support Dr. Booker's assessment that, through at least the end of 2017, Plaintiff either could not, or should not, have engaged in any bending, lifting, or twisting.

An ALJ cannot simply reject a treating physician's opinion as to a claimant's limitations without first attempting to fill any clear gaps in the administrative record.  *See Rosa,* 168 F.3d at 79 (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)).  Further, where an ALJ has not given "good reasons" for assigning less than controlling weight to a treating physician's medical opinion, courts should "not hesitate to remand."  *Halloran*, 362 F.3d at 33.  Accordingly, this matter should be remanded, so that the ALJ may reevaluate the weight to assign to Dr. Booker's opinion regarding Plaintiff's functional limitations, after seeking clarification of the basis of that opinion, as well as any further clinical records from Dr. Booker that may exist for the relevant

---

[31] At the October 19, 2017 Hearing, Plaintiff indicated an intention of returning to Dr. Booker for follow-up.  (*See id*. at 43 (Plaintiff responding as follows to question by ALJ as to whether she had told her doctor that her pain medication was not working: "When I go back I'm going to let him know, when I go back for my other follow-up").)

period (*i.e.*, from October 26, 2017 forward) and that may demonstrate either support, or a lack of support for the restrictions that he placed on Plaintiff in his October 11, 2017 report.

**B.      The ALJ Should Also Have Sought Additional**
**Medical Information Before Discounting Plaintiff's**
**Subjective Complaints of Pain and Functional Impairments.**

Apart from the few progress notes from Dr. Booker that were prepared soon after Plaintiff's SCS procedures, the only other evidence in the Record of Plaintiff's condition after those procedures came from her own testimony at the Hearing.  At that time, Plaintiff testified that, although the SCS implantation had relieved her symptoms, she had *not* experienced "100%" relief.  (R. at 41.)  Rather, she testified that she had "good days" and "bad days," and that the SCS was "not always working for [her]."  (*Id*. at 42.)  She described her pain as remaining at a level of six out of 10, and testified that she still could not bend over, sit down for long, stand up for long, or take a long walk.  (*Id*. at 46, 48.)  She also seemed to testify that she continued to take Gabapentin for back pain, although it was not working.  (*Id*. at 42-43; *but see id*. at 45 (testifying that the Gabapentin was prescribed for her left hand).)  Plaintiff has devoted much of her motion to arguing that the ALJ failed to make a proper assessment of her testimony regarding her continued symptoms.  (*See* Pl. Mem., at 20-25.)

Plaintiff is correct that the ALJ was required to consider her testimony in formulating her RFC.  *See Genier*, 606 F.3d at 49 (holding that an ALJ "is required to take [a] claimant's reports of pain and other limitations into account").  Further, as noted above, if an ALJ determines that a claimant's statements are not supported by the medical record, then the ALJ's decision must also include "specific reasons for the weight given to the individual's symptoms[] [and] be consistent with and supported by the evidence," and those reasons must be "clearly articulated," so that a subsequent reviewer may assess how the adjudicator evaluated the individual's symptoms.  (*See*

Discussion, *supra*, at Section I(F) (quoting SSR 16-3p).)  An ALJ's failure to consider the relevant factors in evaluating a claimant's subjective reports of his or her symptoms, including pain, is grounds for remand.  *See, e.g., Jaeckel v. Colvin,* No. 13cv4270 (SJF), 2015 WL 5316335, at *11 (E.D.N.Y. Sept. 11, 2015) (collecting cases where failure to follow steps of assessing claimant's testimony warranted remand); *see also* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3) (setting out relevant factors).

In this case, the ALJ determined that Plaintiff's testimony concerning the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record . . . because the medical and other evidence show[ed] that [her] functioning significantly improved."  (R. at 21.)  In support of this determination, the ALJ observed that Plaintiff's testimony that "the SCS only provided minor relief on some days[,] with her symptoms generally remaining the same[, and] with bad days that keep her from performing even simple chores such as washing the dishes" was "inconsistent with physician progress notes."  (*Id.* at 21-22.)  Specifically, the ALJ cited Dr. Booker's notes from the week immediately following the trial SCS implantation (referred to by the ALJ as "contemporaneous" records), in which Plaintiff was noted to have reported "excellent coverage with 100 percent relief, except with some complaints of pain at night," as well as the "ability to walk longer [and] stand longer doing dishes."  (*Id.* at 22.)  The ALJ further stated that, based on Dr. Booker's records, Plaintiff was "no longer a candidate for further surgical intervention given the positive results from her treatment," and that she was not suffering "any debilitating side effects from her [] treatment."  (*Id.*)

As an initial matter, the Court notes that, in rejecting Plaintiff's subjective complaints, the ALJ did not expressly consider the relevant factors outlined above.  (*See* Discussion, *supra*, at

Section I(F); 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3).)  Instead, without reviewing

those factors, the ALJ summarily concluded that Plaintiff's Hearing testimony contradicted the

"medical and other evidence" in the Record.  This was insufficient.

      Moreover, Dr. Booker's notes do *not* state, as recited by the ALJ, that Plaintiff was "no

longer a candidate for further surgical intervention given the positive results from her treatment";

rather, after indicating that Plaintiff had previously undergone disc decompression surgery,

which did not relieve her pain, Dr. Booker's notes merely go on to state that Plaintiff was "not a

candidate for surgery" (R. at 732), presumably meaning that further corrective surgery (as

opposed to pain management) was not advisable.  Nor does the single progress note from

Dr. Booker contained in the Record for the period subsequent to the permanent SCS implantation

reflect, as the ALJ stated, that Plaintiff was not experiencing "any debilitating side effects from

her [] treatment."  Instead – while not discussing the severity of the problem – that note reflects

that, after the procedure, Plaintiff was having "some trouble sleeping at night," and it also notes a

new medication prescription, potentially for pain.  (*See id*. at 731; *see also* Background, *supra*, at

Section B(1) and n.25.)  Before relying on the apparent assumption that Plaintiff was

experiencing no significant side effects, or that her difficulty sleeping was not "debilitating," the

ALJ should have sought clarification from Dr. Booker on these points.

      Most importantly, by failing to solicit any further treatment records from Dr. Booker for

the period of Plaintiff's purported "medical improvement," the ALJ made no attempt to

determine whether there might have been a sound basis, grounded in clinical observation or

testing, for Plaintiff's testimony that she was experiencing better days and worse ones, after the

SCS implantation.  By relying solely on a brief snapshot of Plaintiff's immediate, positive

reaction to the SCS procedures, the ALJ had no way to know, without further development of the

Record, whether the snapshot on which he was relying was illustrative of overall, sustained

"improvement," or, instead, reflected only how Plaintiff presented to Dr. Booker shortly after

procedures that, after a longer time, may have proven to be less successful.

For these reasons, the ALJ's assessment of Plaintiff subjective complaints of pain and of

the degree of her functional impairments should also be reevaluated on remand, after further

development of the Record.

> **C.     As a General Matter, the ALJ Erred**
> **by Failing To Develop the Record For**
> **the Post-Operative/Post-Hearing Period.**

As discussed above, the ALJ's discounting of both Dr. Booker's opinion regarding

Plaintiff's functional restrictions and Plaintiff's own testimony regarding her pain and her

functional capacities were infected by the ALJ's failure to seek clarification of Dr. Booker's

opinion and to obtain his follow-up treatment records.  As a broader matter, though, the Court

notes that it is not possible to determine if substantial evidence in the Record supports the ALJ's

conclusion that Plaintiff was not disabled for the period starting October 26, 2017, when the

Record is essentially devoid of medical evidence for that period.

As a matter of law, the ALJ is required to develop the complete medical history for at

least a 12-month period prior to the date of the application.  *See* 20 C.F.R. §§ 404.1512(b)(1),

416.912(b).  These regulations, however, establish only the minimum acceptable standard

regarding the period for which an ALJ is obligated to develop the record, and a more extended

period of record development will be required where it would be reasonably expected to produce

information necessary for a decision.  *See Corporan v. Comm'r of Soc. Sec.*, No. 12cv6704

(JPO), 2015 WL 321832, at *27 (S.D.N.Y. Jan 23, 2015) (finding that the ALJ erred by not

attempting to procure "current" records from the hospital where Plaintiff told him at the Hearing

that she recently began treatment with a new psychiatrist).  In fact, post-hearing evidence is "commonly considered in social security disability cases."  *Id.* (citing *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir.2010)); *see also Romero v. Heckler*, 586 F. Supp. 840 (S.D.N.Y. 1984) (the evidence included a post-hearing consultive examination conducted at the request of the ALJ).

In this instance, as shown by the summary of the evidence set out above, there is very little medical evidence in the record after August 1, 2017, the date of Plaintiff's initial procedure for the implantation of a trial SCS.  Then, after undergoing a second procedure for the permanent implantation of such a device on September 25, 2017, the Record contains only a *single* doctor's note regarding Plaintiff's progress.  As for the period after October 26, 2017 – *i.e.*, the period now under review – there is *no* medical evidence in the Record, except for notes of an October 31, 2017 examination and follow-up for an abdominal issue, from a physician who was not one of Plaintiff's treaters for her back condition.

While the few pertinent progress notes that do exist for the time after Plaintiff's two SCS procedures appear to evidence significant improvement, they are in conflict with Plaintiff's later testimony that she was not doing as well as was seemingly portrayed in those notes.  As Plaintiff argues, "[w]hen the record contains inconsistent evidence regarding a plaintiff's impairments, as it does here, a small sampling of treatment notes does not substantially support the finding of medical improvement."  (Pl. Mem., at 16 (quoting *Carbone v. Astrue*, No. 08-CV-2376 NGG, 2010 WL 3398960, at *9 (E.D.N.Y. Aug. 26, 2010)); *see also Kennedy v. Berryhill*, No. 16-CV-00855 (MAT), 2018 WL 5619838, at *5 (W.D.N.Y. Oct. 29, 2018) (holding that the ALJ's interpretation of two treatment notes was insufficient to support a finding that a claimant was no longer disabled).)  It is especially frustrating that the ALJ made no attempt to obtain any

relevant medical evidence for the period at issue when he did not actually issue his decision until March 21, 2018, a full five months past the Hearing date.  Obtaining records from Dr. Booker and from Plaintiff's other treaters for that five-month period would have enabled both the ALJ and the Court to have far greater confidence that the "small sampling" of treatment notes from prior to the determined period of "medical improvement" were, in fact, representative of Plaintiff's condition throughout that period.

As a last point, this Court notes that an ALJ may not rely on his own lay opinion to determine the extent of a Plaintiff's functional impairments.  *See Rosa,* 168 F.3d at 79; *see also Balsamo*, 142 F.3d at 81 (an ALJ may not "arbitrarily substitute his own judgment for competent medical opinion" (internal quotation marks and citations omitted)); *Merriman v. Comm'r of Soc. Sec.*, No. 14cv3510 (PGG) (HBP), 2015 WL 5472934, at *18 (S.D.N.Y. Sept. 17, 2015 ("Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." (citation omitted)); *Deshotel v. Berryhill,* 313 F. Supp. 3d 432, 433-34 (W.D.N.Y. 2018) (remanding for failure to develop the record, where, in absence of medical opinion evidence, ALJ had improperly substituted lay opinion in making RFC determination).  Here, the ALJ found that, for the period commencing on October 26, 2017, Plaintiff had, *inter alia*, the ability to "occasionally balance, stoop, kneel, crouch, [and] crawl."  (R. at 21.)  The ALJ, however, does not specifically rely on any medical opinion evidence to support that portion of his RFC determination.  As it appears that it was therefore based on his own lay opinion, it should be reconsidered, in light of a more fully developed Record.  If the ALJ is unable to obtain a function-by-function assessment from

one of Plaintiff's treating physicians for the period at issue, then he should request a consultative examination.

### D.    The ALJ's Errors Were Not Harmless.

The ALJ's failures to develop the Record cannot be said to have been harmless, given that, as discussed above, they affected the weight he assigned to the opinion of Plaintiff's treating physician, his assessment of Plaintiff's subjective complaints of pain, and his determination of Plaintiff's RFC.  It is certainly possible that the further development of the Record would support the ALJ's determination that, following the permanent implantation of an SCS, Plaintiff in fact experienced medical improvement to a degree that rendered her no longer disabled under the Act.  It is also possible, however, that, upon review of a more developed Record, the ALJ's decision might change – even if only with respect to the additional three months for which Dr. Booker had indicated that Plaintiff should be considered restricted from any bending, lifting, or twisting.  As development of the Record may therefore affect the outcome of Plaintiff's claim, remand in appropriate.

### CONCLUSION

For all of the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Dkt. 17) is granted, and Defendant's cross-motion for judgment on the pleadings (Dkt. 20) is denied.

This case is hereby remanded for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).  Upon remand, the ALJ is directed as follows:

    (1)    to develop the Record by

        (a)    seeking clarification from Dr. Booker regarding the basis of his opinion regarding Plaintiff's functional limitations;

       (b)    obtaining the complete medical records of any medical source who evaluated or treated Plaintiff for her back condition after she underwent the procedure for the permanent implantation of a spinal cord stimulator ("SCS"); and

       (c)    soliciting a medical source statement, including a function-by-function assessment of Plaintiff's exertional abilities, from one of Plaintiff's treating physicians or, if necessary, a consultative examiner, for the period after the permanent implantation of the SCS device;

    (2)    upon development of the Record, to reweigh the medical opinion evidence, to reevaluate Plaintiff's subjective complaints of pain and regarding the extent of her functional impairments; and to reassess Plaintiff's RFC; and

    (3)    to the extent the ALJ revises Plaintiff's RFC by adding further limitations, to recall the VE, if necessary, for additional testimony regarding the availability of jobs that could be performed by a person with those limitations.

In light of this Order, the Clerk of Court is directed to close Dkts. 17 and 20 on the

Docket of this action, and to enter judgment in Plaintiff's favor, directing remand.

Dated:  New York, New York
       September 29, 2020

SO ORDERED

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

All counsel (via ECF)